UNITED STATES of America, Plaintiff-Appellee,

v.

Moses MARSHALL, a.k.a. Raheen;  Darrell Green, a.k.a. Dred;  and Zanuel Robert Gallard, a.k.a. Easy, Defendants-Appellants.

No. 97-2699.

United States Court of Appeals,

Eleventh Circuit.

April 26, 1999.

Appeals from the United States District Court for the Northern District of Florida. (No. 3:96-cr-74-3-RV), Roger Vinson, Judge.

Before TJOFLAT, COX and HULL, Circuit Judges.

TJOFLAT, Circuit Judge:

The defendants in this case were convicted on multiple drug charges.  The convictions, however, were obtained by the Government's use of improperly admitted evidence.  We therefore vacate the convictions, and remand the case for a new trial.

I

The facts of this case center on an alleged drug conspiracy in Pensacola, Florida.  The defendants—Zanuel Gallard, Darrell Green, and Moses Marshall—provided Eric Hicks with substantial quantities of crack cocaine at various times between March and September 1996.  Hicks, in turn, sold the crack to other individuals, and gave the money from the sales to the defendants (presumably keeping some portion for himself).

In August, Hicks' home was searched by officers of the Pensacola Police Department;  the search produced potentially incriminating evidence of drug trafficking.  The police offered to cease their investigation of Hicks if he would work for them as an informant.  Hicks accepted the offer.  Shortly thereafter, agents of the federal Drug Enforcement Administration (DEA) began working with the Pensacola police regarding the drug activities in which Hicks was involved.

On September 2, 1996, Gallard and Green came to Hicks' home and gave him one ounce of crack to sell. The next day (September 3), Hicks took the crack to the police, who gave him $860 in recorded bills with which to pay for the crack.[1] Hicks paged Gallard on September 8 and arranged a meeting at a local convenience store. All three of the defendants came to the store, at which time Hicks paid Green the $860 (which was subsequently given to Marshall); Gallard then gave Hicks five more ounces of crack to sell. Hicks gave the crack to the police later that day. Two days later (September 10), Hicks paged Gallard to arrange another meeting at the convenience store. This time, Green and Marshall appeared at the convenience store; Hicks gave them $2,700 in recorded bills as partial payment for the previous supply of crack.

On September 13, Gallard paged Hicks and requested the remainder of the money due on the crack. Hicks met with Gallard and Green and gave them another $1,800 in recorded bills. Green promised to deliver more crack later that day. That afternoon, Hicks met with Gallard and Marshall at a music store. While Hicks and Marshall went inside the store, Gallard put a bag in Hicks' car. The police, who were conducting surveillance at the meeting, retrieved the bag from Hicks' car; the bag contained video and audio tapes, but no drugs.

After learning of the contents of the bag, the police, suspecting that the defendants still had the crack, stopped the defendants on an interstate highway and arrested them. A subsequent search of the vehicle produced no contraband. The police then searched the defendants' residence.[2] They discovered substantial amounts of cash (including some of the recorded bills from the second crack purchase), along with chemistry beakers, scales, sandwich bags, baking soda, a pager, and sales records—in other words, a fully-equipped crack production factory. Missing from the factory, however, was any cocaine.

---

[1] The "recorded bills" were pieces of currency whose serial numbers had been recorded so that they could be later identified as the bills used in a given drug transaction.

[2] The defendants lived together in a rented trailer in Pensacola.

The defendants were indicted, tried together, and convicted of the following offenses: Green and Gallard were convicted on one count of conspiracy to possess with intent to distribute crack cocaine, and two counts of possession with intent to distribute (based on the September 2 and September 8 deliveries of crack to Hicks); Marshall was convicted on one count of conspiracy to possess with intent to distribute crack cocaine, and one count of possession with intent to distribute (based on the September 8 delivery). All three defendants appeal.

## II.

The defendants challenge two evidentiary decisions made by the district court. We conclude, for the reasons set forth in this section, that both decisions constituted an abuse of discretion.[3] Furthermore, the decisions taken together cannot be considered harmless error and therefore necessitate vacatur of the defendants' convictions.[4]

## A.

The first evidentiary decision challenged by the defendants relates to the testimony of Government witness Charles Gravat, the DEA agent who supervised the joint police/DEA investigation. On cross-examination, Gravat was asked whether Hicks had sources of cocaine other than the defendants. Gravat responded that Hicks had at least three separate sources of cocaine. The Government, on redirect examination, asked Gravat whether he believed that the crack cocaine obtained by the police on September 3 and 8 came from a source other than the defendants. Gravat, over objection, responded in the negative.[5]

_____

[3]Rulings regarding the admissibility of evidence are reviewed for an abuse of discretion. *See United States v. Johnson,* 139 F.3d 1359, 1365 (11th Cir.1998).

[4]Defendants Gallard and Green also raise challenges to their sentences. Because we hold that their convictions must be vacated, we do not reach the sentencing issues.

[5]The exact wording of the exchange was as follows: The prosecutor asked Gravat, "Do you believe that Mr. Hicks acquired the crack cocaine that was recovered on the 3rd and the 8th from another source?" After the defendants' objection was overruled, Gravat answered, "No, sir, I believe it came from Mr. Easy [an alias for Gallard], Mr. Gallard, and Mr. Green." (It is unclear from the transcript why Gallard was named twice.)

The district court abused its discretion in overruling the defendants' objection to the prosecution's question. Gravat was not an expert witness such that his opinion carried weight as an expert opinion. Consequently, the admissibility of his opinion as to the source of the crack cocaine was governed by Rule 701.[6] Under that rule, the opinion of a lay witness on a matter is admissible only if it is based on first-hand knowledge or observation—for example, a witness' opinion that a person with whom he had spoken was drunk, or that a car he observed was traveling in excess of a certain speed. In this case, Gravat—who was not present at any of the meetings between Hicks and the defendants—had no personal knowledge regarding the origin of the cocaine given to him by Hicks. Gravat's answer was therefore inadmissible.

The Government contends that Gravat's answer was rehabilitation evidence to counter the defendants' impeachment of Hicks' credibility, and was therefore admissible under Rule 608(a)(2).[7] Hicks' credibility was attacked in the defendants' opening statements to the jury (and in Hicks' cross-examination); thus, the condition precedent for evidence of truthful character was satisfied. *See* Fed.R.Evid. 608(a)(2). The question asked by the prosecutor, however, was not a proper way of eliciting such evidence. The question, "Do you believe that Mr. Hicks acquired the crack cocaine ... from another source?" was primarily a question regarding a fact (the source of the crack cocaine), and was only indirectly a question regarding Hicks' truthfulness. If

---

Although Gravat did not specifically mention Marshall, his answer arguably implicated Marshall for at least two reasons. First, the question, taken in context, was whether the crack cocaine came from a source other than the defendants; Gravat answered "No." Second, other evidence associated Marshall with Green and Gallard; thus, if the crack cocaine came from Green and Gallard, the jury likely would have inferred that it came from Marshall as well.

[6]Rule 701 states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

[7]Rule 608(a)(2) states: "The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but ... evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."

4

the prosecutor was seeking to elicit evidence regarding Hicks' veracity, the question should have been phrased very differently—for example, "What is your opinion as to Hicks' character for truthfulness?" *Cf. United States v. Lollar,* 606 F.2d 587, 589 (5th Cir.1979). The question as asked cannot be considered proper under Rule 608(a)(2). Thus, the district court erred in admitting Gravat's answer.

Having determined that the district court erred, we now consider the significance of that error. In doing so, we must examine the state of the evidence apart from Gravat's answer. The defendants were indicted for possession of crack cocaine with the intent to distribute. One of the key elements of this offense is possession.[8] The only direct evidence of possession of cocaine by the defendants was the testimony of Hicks. Hicks testified that the defendants gave him cocaine on September 2 and 8. There were no other witnesses to these transactions.[9] To be sure, the Government had substantial circumstantial evidence linking the defendants to crack cocaine sales—the defendants had large sums of cash (including the recorded bills used by Hicks) and lived in a trailer filled with items used in crack production. Furthermore, the Government had evidence that it gave money to Hicks, that he then met with someone, and that after the meeting he produced some crack cocaine. This evidence, however, standing alone, would have presented a fairly weak case of possession, especially in light of the evidence produced by the defendants that Hicks had numerous sources of cocaine. Instead, the defendants' possession of crack cocaine was established largely by Hicks' testimony.

The defendants presented a variety of evidence calling Hicks' credibility into question. Hicks was a drug dealer himself, had a felony conviction for manslaughter, and had recently been arrested on aggravated

---

[8]The defendants were also convicted of conspiracy to possess with intent to distribute, which, of course, does not require proof of possession. In this case, however, a significant part of the evidence of the conspiracy was the evidence of the substantive offense.

[9]The second meeting was conducted under police surveillance. The person(s) meeting Hicks, however, arrived in a car with tinted windows; the police were thus unable to identify the occupant(s) of the vehicle. Only one person—later identified as Gallard—ever exited the car during the meeting. The police never saw Gallard (or anyone else) give anything to Hicks.

assault charges for severely beating his ex-wife. In addition, the defendants pointed out that Hicks was granted immunity from prosecution in exchange for his work as an informant; consequently, they argued, he had strong incentives to manufacture evidence for the Government. Finally, the defendants presented evidence that Hicks had a reputation of not being very truthful.

Thus, apart from agent Gravat's statement, the only direct evidence that the defendants ever possessed crack cocaine was the testimony of an informant of questionable credibility. Gravat's statement potentially affected this situation in two ways. First, the jury might have taken Gravat's statement as additional evidence of possession by the defendants. The jury might have surmised that Gravat, a DEA agent who had worked extensively with this investigation, had information not available to the jury that he used to conclude that the defendants were the likely source of the crack cocaine produced by Hicks. Furthermore, this evidence came from a source far more credible than Hicks: a law enforcement officer who was unimpeached by the defendants. Second, Gravat's statement might have been taken as evidence of Hicks' credibility. The jury might have otherwise been inclined to disbelieve Hicks; however, in light of an experienced DEA agent's willingness to believe his informant's claim that the cocaine he produced came from the defendants, the jury might choose to believe Hicks on this matter (and others).

We need not decide whether the erroneous admission of Gravat's statement, standing alone, would be enough to require vacatur of the defendants' sentences, because the district court made another evidentiary error that, combined with this one, clearly necessitates vacatur.

B.

The second evidentiary decision challenged by the defendants relates to evidence, presented pursuant to Fed.R.Evid. 404(b), that defendants Gallard and Green previously were arrested in Raleigh, North Carolina, on drug charges.[10] The arresting officer testified that the arrest was based on the defendants'

---

[10]The defendants twice objected to this testimony: when the Government proffered the evidence and after it was presented.

6

presence in a house in which police discovered crack production paraphernalia (some of which was stained with cocaine residue) and large amounts of cash. He also testified that Green and Gallard gave false names at the time of the arrest. According to the officer, further investigation revealed that there was no evidence linking the defendants to the drug production; consequently, the charges were dismissed.

In order to determine whether the district court abused its discretion in admitting this evidence, we must first determine whether the evidence had any probative value. *See* Fed.R.Evid. 404(b). The defendants in this case were charged with possession with intent to distribute and conspiracy to possess with intent to distribute. Both crimes require proof of intent to distribute—in other words, assuming that the defendants had possession of crack cocaine, the Government had to prove that the defendants intended to distribute the crack to other persons. Intent may be proven, pursuant to Rule 404(b), by evidence of prior "bad acts" in which the same intent was required. *See United States v. Green,* 40 F.3d 1167, 1174 (11th Cir.1994). The circumstances surrounding Gallard's and Green's prior arrest, according to the district court, demonstrated their intent to distribute cocaine, and testimony relating to the arrest was therefore admitted into evidence.

The problem with the district court's reasoning is that there was nothing in the evidence presented that tended to prove intent to distribute. In order for the evidence to be probative of intent, the jury would have to believe that Gallard and Green previously committed the offense of possession with intent to distribute (or conspiracy to do the same). The evidence of the arrest was insufficient to prove commission of the offense; other evidence had to be presented from which the jury reasonably could conclude that the offense was committed. *See United States v. Diaz-Lizaraza,* 981 F.2d 1216, 1225 (11th Cir.1993). In this case, the police officer who testified regarding the arrest did not testify as to any connection between the defendants and the crack production taking place in the house in which they were arrested. The Government presented no other evidence on the matter. Consequently, the jury could not reasonably have concluded—based on the evidence before it—that Gallard and Green had been involved in crack distribution,

and therefore the prior arrest and the circumstances surrounding it were not probative of intent. We thus conclude that the district court abused its discretion in admitting the evidence.

The evidence relating to the arrest was potentially prejudicial in two ways.[11] First, it tended to establish guilt by association—because Gallard and Green cavorted with drug dealers, they must be drug dealers themselves.[12] Second, it functioned as impermissible character evidence—if Green and Gallard were willing to obstruct justice by lying to police regarding their identity, their lawlessness might also extend to drug dealing. Furthermore, the potential prejudice was exacerbated by the Government's use of the prior arrest evidence in its closing argument.[13]

C.

We next turn to the inquiry whether these two evidentiary errors, taken together, were harmless.[14] We conclude that, in light of the potential prejudice outlined above, they were not. Consequently, the district court's errors necessitate vacatur of the defendants' convictions.

III.

For the foregoing reasons, the defendants' convictions are

VACATED.[15]

---

[11]Although only Gallard and Green were arrested, the arrest evidence was also potentially prejudicial to Marshall due to his association with Green and Gallard.

[12]The police officer who arrested Gallard and Green testified that another individual who was at the house when Gallard and Green were arrested was subsequently convicted on drug charges.

[13]In closing argument, the prosecutor recounted the facts surrounding the prior arrest and pointed out the similarities between those facts and the facts of this case. He then told the jury that they could use those similarities to determine whether the defendants had the requisite intent to distribute.

[14]We need not decide whether either error, standing alone, would have been harmless.

[15]Defendant Marshall challenges the sufficiency of the evidence to convict. This challenge is without merit. Hicks' testimony, if believed, would be more than sufficient to sustain Marshall's convictions.