PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
08/18/99
THOMAS K. KAHN
CLERK

----------------------
No. 97-6718
----------------------
D. C. Docket No. 97-00024-001

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDDIE ROOSEVELT HANDS,

Defendant-Appellant.

-----------------------
Appeal from the United States District Court
for the Southern District of Alabama
-------------------------
**(August 18, 1999)**

Before BARKETT, Circuit Judge, and KRAVITCH and MAGILL[*], Senior Circuit Judges.

KRAVITCH, Senior Circuit Judge:

---

[*]Honorable Frank J. Magill, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

After a four-day trial, a jury convicted Eddie Roosevelt Hands ("Hands") of one count of conspiracy to distribute and possess with intent to distribute narcotics, in violation of 21 U.S.C. § 846, and one count of distributing and possessing with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a). The jury also determined that Hands should forfeit $725,000 pursuant to 21 U.S.C. § 853. The district court sentenced Hands to concurrent prison sentences of life on the conspiracy count and twenty years on the distribution and possession count. Hands appeals his conviction and the forfeiture award, contending that the trial court's erroneous admission of graphic evidence of his abuse of his wife and the prosecutor's improper statements during closing arguments deprived him of a fair trial.[1] We reverse and remand for a new trial.

## I. BACKGROUND

State law enforcement agents, investigating drug activities in and around Monroe County, Alabama, brought drug-related charges against a number of people.

---

[1]Hands raises a number of other challenges to his conviction and sentence, arguing, inter alia, (1) that the government presented insufficient evidence to convict him on either count; (2) that the procedures the district court used to present the forfeiture issue to the jury constituted reversible error; (3) that because a minor error in the district court's instruction made it unclear which type of drug the jury found Hands had conspired to distribute, he should have received a sentence no longer than the shortest of the statutory maximum sentences applicable to the types of drugs in question; and (4) that the district court erred in applying a four-point increase to his offense level pursuant to United States Sentencing Guideline § 3B1.1(a). Because we reverse for a new trial on other grounds, we do not reach these issues.

2

Many of these people eventually pleaded guilty to drug charges; some of them, in the course of their cooperation with the government, identified Hands as a participant in the local drug trade. As a result of the investigation, a grand jury indicted Hands on one count of conspiracy to distribute large amounts of powder cocaine, crack cocaine, and marijuana, and one count of distributing and possessing with intent to distribute approximately two ounces of powder cocaine. The indictment also contained a forfeiture count, which alleged that Hands was subject to forfeit five parcels of real property[2] and "$725,000 in proceeds."[3] At trial, the government primarily relied upon the testimony of several confessed drug dealers who testified that they had bought or sold cocaine, cocaine base, or marijuana from Hands, had transported or sold drugs for Hands, or had witnessed Hands engaging in drug dealing or production at various times over a 23-year period. Each of these witnesses testified in exchange for, or in hope of receiving, a reduced sentence or a decreased number of charges.

Hands's wife, Doris Hands, testified for the defense. Hands then took the stand on his own behalf. While cross-examining him, the prosecutor elicited testimony that he had been charged with beating his wife. The government then introduced into

[2]During the jury's deliberations, the trial court determined that the government had not offered sufficient proof that Hands owned any of this real property; it therefore ordered the jury not to consider whether the property was forfeitable.

[3]Superseding Indictment, R1-21 at 4, ¶ 6.

3

evidence six color photographs taken of Doris Hands shortly after the abuse, which showed her injuries. During the government's closing argument, the prosecutor repeatedly used inflammatory language to describe Hands. The jury returned guilty verdicts on both substantive charges and returned a verdict of forfeiture of $725,000.

## II. DISCUSSION

A. <u>Facts Surrounding the Admission of the Spousal Abuse Evidence</u>

Doris Hands testified as part of Hands's case in chief that she had been at home full time, caring for her and Hands's children, during much of the time covered by the indictment and that she had never witnessed any drug dealing on the property. She acknowledged that because she and Hands were often occupied during the day—he with his job and she with child care—she did not spend all of her time with him. Neither the defense nor the prosecution questioned Doris Hands about her relationship with her husband.

Subsequently, Hands took the stand in his own defense. On cross-examination, the prosecutor asked Hands about his use of a number of guns, specifically questioning him about how often he had carried a particular handgun.[4] Hands volunteered that he had not carried that gun since the sheriff took away his handgun

---

[4]Hands's gun-carrying practices were relevant to the government's case because some prosecution witnesses had testified that he had a practice of carrying one of several guns while dealing drugs.

4

permit. The prosecutor asked why the sheriff had revoked the permit, and Hands responded that the sheriff was "pissed off"[5] that Hands had dropped charges against a young man who had shot Hands in a random drive-by incident. The prosecutor then asked whether Hands had lost his permit because he had beaten Doris Hands. Hands answered, "No," and the prosecutor asked, "Didn't your wife file charges against you for beating her?" and "Didn't you beat your wife in recent months?"[6] The district court overruled defense counsel's repeated objections to the line of questioning, and Hands admitted that someone had filed charges against him in 1994 because, as he put it, he and Doris Hands had had "a fight" in which he sustained two broken fingers.[7] The prosecutor asked, "And you got broken fingers because you beat her really bad; isn't that right?"[8]

The prosecutor then moved to admit into evidence six Polaroid photographs of Doris Hands taken after the beating. At sidebar, defense counsel objected to the line of questioning and the admission of the photographs, arguing that the evidence was irrelevant and overly prejudicial. The judge replied,

---

[5]Trial Tr., R10 at 811.

[6]Id. at 812.

[7]Id. at 813.

[8]Id.

[The evidence] has probative value . . . in that his wife came in and presented herself as a dutiful wife who stayed at home all the time and had nothing to do but look after her dear husband. And this is just diametrically opposed to that and is in direct impeachment of everything his wife said when she was on the witness stand.[9]

The judge also stated that the prosecution could use the wife-beating evidence to show that the pistol permit "was revoked when he beat up his wife."[10] The court admitted the photographs[11] and a document dated February 18, 1994, revoking Hands's handgun permit.[12] On further questioning, Hands continued to insist that the revocation was not connected to the domestic violence charges. The prosecutor abandoned the line of questioning and did not introduce any further evidence connecting the two incidents. The district court denied the defense's subsequent motion for a mistrial.[13]

B.     Admissibility of the Spousal Abuse Evidence

We review the district court's evidentiary rulings for abuse of discretion. See United States v. Johnson, 139 F.3d 1359, 1365 (11th Cir. 1998), cert. denied, __ U.S.

---

[9]Id. at 815.

[10]Id. at 815-16.

[11]See id. at 816; Gov't Ex. 76.

[12]See id. at 817; Gov't Ex. 77.

[13]See Trial Tr., R10 at 839.

6

__, 119 S. Ct. 2365 (1999). We conclude that the spousal abuse evidence was inadmissible because it was irrelevant. See Fed. R. Evid. 401, 402. Even if the evidence had been relevant, the district court would have abused its discretion in admitting it because its prejudicial nature greatly outweighed its probative value, see Fed. R. Evid. 403.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The government argues that the domestic violence evidence was relevant in three ways. First, it suggests, the entire line of questioning that began with Hands's statement that he had not carried a handgun since the sheriff took away his permit demonstrated the reasons underlying the sheriff's revocation of Hands's handgun permit, which in turn helped to show that Hands continued to carry a handgun after the revocation.[14] This argument simply does not make sense: the record reveals no

---

[14]Although the legality of Hands's gun use was not at issue (the indictment did not charge Hands with weapons violations), the government claimed at oral argument that Hands's gun-carrying habits were relevant because prosecution witnesses had testified that they had seen Hands carrying various firearms during drug transactions. Proof of whether Hands had carried a handgun after the permit revocation would not have corroborated or contradicted these witnesses' testimony, however. Hands stated that he continued to use a shotgun and a rifle after the revocation, and the witnesses who claimed that he carried firearms during the relevant period did not explain whether they meant handguns or other firearms.

potential connection between the reasons underlying the revocation and Hands's subsequent gun-carrying habits.[15]

Second, the government argues that the spousal abuse evidence was relevant because it contradicted the testimony of Doris Hands. This evidence could serve no such impeachment purpose, however, because it did not contradict Doris Hands's testimony: nothing she said on the stand conflicted with evidence that her husband had abused her. The judge stated at sidebar that the evidence of domestic abuse impeached her testimony because she had "presented herself as a dutiful wife who stayed at home all the time and had nothing to do but look after her dear husband."[16] Our review of the transcript, however, shows that Doris Hands gave no testimony about her relationship with her husband and did not say or imply that she was "dutiful." During oral argument and in its brief to this court, the government contended that the evidence impeached Doris Hands's testimony in a second way, because she had stated or implied that she "never saw her husband commit any illegal

---

[15]The government's litigation strategy confirms our conclusion that the sheriff's reason for revoking the permit was irrelevant to the case. Once it successfully had introduced the spousal abuse evidence, the prosecution made only a perfunctory effort to show a connection between the beating and the permit revocation; in fact, the prosecutor had not come prepared with any admissible evidence of when the beating took place or when charges were filed against Hands.

[16]Trial Tr., R10 at 815.

behavior."[17]  This account distorted her testimony; although she stated that she had never witnessed her husband engaging in any drug use or drug dealing, no one asked her, and she said nothing, about whether she knew if her husband had engaged in any other illegal behavior.  The evidence therefore could not have served to impeach Doris Hands.

Finally, the government asserts that the evidence was relevant because it suggested that Hands might have been lying when he stated the reasons for the permit revocation.  Otherwise irrelevant evidence sometimes may be admissible when used to impeach a witness's testimony.  "Although it is not one of the . . . permissible purposes [listed in Fed. R. Evid. 404(b) for introducing evidence of a criminal defendant's other bad acts], an attempt to impeach through contradiction a defendant acting as a witness is indisputably a legitimate reason to introduce evidence of other crimes or wrongs."  United States v. Copelin, 996 F.2d 379, 382 (D.C. Cir. 1993), overruled on other grounds by United States v. Rhodes, 62 F.3d 1449, 1454 (D.C. Cir. 1995), vacated, 517 U.S. 1164, 116 S. Ct. 1562 (1996).  In this case, however, the entire line of questioning, beginning with the government's query as to the permit revocation, was irrelevant; the government could not bootstrap irrelevant evidence

---

[17]Gov't Br. at 42.  We note that the government, unlike the district judge, had access to the complete transcript and should have been able to verify that it was describing Doris Hands's testimony accurately.

9

into the trial by using it to impeach the answers to irrelevant questions. See <u>United States v. Reed</u>, 700 F.2d 638, 644 (11th Cir. 1983) (stating that prosecutor could not justify a question as "intended to highlight a prior inconsistent statement" when entire line of questioning was improper); <u>see also</u> <u>United States v. Diecidue</u>, 603 F.2d 535, 550 (5th Cir. 1979)[18] ("Extrinsic evidence of specific instances of a witness'[s] conduct is generally not admissible to contradict his testimony on matters collateral to the issues in the case and so attack his credibility.").[19]

Even if the spousal abuse testimony and photographs had been relevant, this evidence did not meet the balancing test set out in Federal Rule of Evidence 403. Under Rule 403, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. Rule 403 is an "extraordinary remedy," <u>United States v. Utter</u>, 97 F.3d 509, 514 (11th Cir. 1996) (citation omitted), whose "major function . . . is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." <u>United States v.</u>

---

[18]Decisions by the former Fifth Circuit issued before October 1, 1981 are binding precedent in the Eleventh Circuit. <u>See</u> <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[19]The evidence clearly was not admissible to show that Hands had a violent or lawbreaking character, a purpose prohibited by Fed. R. Evid. 404(b).

<u>Cross</u>, 928 F.2d 1030, 1048 (11th Cir. 1991) (internal quotation omitted). Although Rule 403 carries a "strong presumption in favor of admissibility," <u>United States v. Church</u>, 955 F.2d 688, 703 (11th Cir. 1992), the domestic violence evidence's prejudicial nature so heavily outweighed its probative value that the district court should have excluded it. <u>See, e.g.</u>, <u>id.</u> (finding error where district court failed to exclude evidence whose danger of unfair prejudice substantially outweighed its probative value).

The evidence had minimal probative value. As discussed above, Hands's testimony that he had physically assaulted his wife did not help to prove any element of the government's case against Hands; its only even arguably legitimate purpose, which we have rejected, was to impeach the testimony of Hands and Doris Hands. The photographs had even less value: because Hands had conceded the point that the government wished to establish—that someone had filed charges against him in connection with a 1994 incident resulting in injury to Doris Hands—the photographs would have been superfluous even if this line of questioning had been appropriate.

On the other side of the Rule 403 inquiry, the evidence had great potential to incite unfair prejudice. Some types of extrinsic acts are particularly "likely to incite a jury to an irrational decision," <u>Church</u>, 955 F.2d at 702; few would doubt that

11

violent spousal abuse falls into this category.[20] See, e.g., State v. Zamudio, 645 P.2d 593, 596 (Or. Ct. App. 1982) ("[T]he public stigma attached to a husband who beats his wife is significant. The inflammatory nature of such a characterization is arguably more substantial than the purchase of marijuana discussed in [another case]."). The domestic violence evidence in this case was particularly likely to incite the jury to an irrational decision because it was graphic and arresting. The jury could observe Hands's obvious size and strength (a former college basketball player, he stood 6'5½" and weighed 235 to 240 pounds). More importantly, the series of six photographs impressed the fact of the domestic abuse on the jury's consciousness with dramatic, graphic impact, making clear the seriousness of the incident. Four of the color photographs show stripes of swollen purple and red welts and bruises across Doris Hands's back and arms. A belt, whip, or other weapon could have inflicted these wounds. Another photograph shows her black eye. The testimony and the photographs, taken together, had an unfairly prejudicial effect, which the district court did not minimize with a limiting instruction. See, e.g., United States v. Fortenberry, 971 F.2d 717, 721 (11th Cir. 1992) (noting curative effect of limiting instruction).

C.    The Error's Effect on the Verdict

[20]The "hoary chestnut 'When did you stop beating your wife?,'" United States v. Elie, 111 F.3d 1135, 1147 (4th Cir. 1997) (Hall, J., dissenting), for example, might lack some of its illustrative power if the topic of domestic violence did not produce such visceral reactions.

An erroneous evidentiary ruling will result in reversal only if the resulting error was not harmless. See Church, 955 F.2d at 700; Fed. R. Crim. P. 52(a). An error is harmless unless "there is a reasonable likelihood that [it] affected the defendant's substantial rights." United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir. 1990). We need not reverse Hands's conviction if the error "had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict." Fortenberry, 971 F.2d at 722. An error may substantially influence an outcome and thus warrant reversal even if the evidence, had no error occurred, would have been sufficient to support the conviction. See United States v. Marshall, 173 F.3d 1312, 1318 & n.15 (11th Cir. 1999) (finding two evidentiary errors not harmless and reversing convictions despite finding that defendant's challenge to the sufficiency of the evidence was "without merit" because one witness's "testimony, if believed, would be more than sufficient to sustain [the] convictions"); see also United States v. Edwards, 576 F.2d 1152, 1155 (5th Cir. 1978). We determine whether an error had substantial influence on the outcome by weighing the record as a whole, see United States v. Montalvo-Murillo, 495 U.S. 711, 722, 110 S. Ct. 2072, 2080 (1990), examining "the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt," Reed, 700 F.2d at 646 (citation omitted). This inquiry leads us to conclude that the erroneous

13

introduction of the domestic violence evidence was not harmless.

We first examine the nature of the evidence against Hands. This circuit has found even prejudicial nonconstitutional error harmless in criminal cases in which the government has presented highly convincing, admissible evidence of a defendant's guilt, such as a confession, see United States v. Ballard, 586 F.2d 1060, 1062 (5th Cir. 1978); audiotapes or videotapes of the defendant engaging in or discussing the alleged criminal activity, see United States v. Wilson, 149 F.3d 1298, 1302 (11th Cir. 1998); the defendant's fingerprints on contraband, see United States v. Mendez, 117 F.3d 480, 482, 486 (11th Cir. 1997); drugs or other incriminating items found in the defendant's possession, see Wilson, 149 F.3d at 1302; and extensive documentary evidence of the crime, see United States v. Mills, 138 F.3d 928, 936 (11th Cir.), cert. denied, __ U.S. __, 119 S. Ct. 515 (1998). In many of these cases, compelling physical evidence combined with the testimony of unbiased observers, creating an overwhelming case against the defendant. See id. (documentary evidence supported by several uncontradicted, unbiased witnesses); Mendez, 117 F.3d at 482, 486 (several unbiased witnesses). The government presented no similarly compelling pieces of evidence in this case.

Although the indictment alleged that Hands had distributed drugs from his home on a large scale, a thorough search of his house, land, and automobiles yielded

14

no drugs, drug residue, drug paraphernalia, cash, incriminating documents, or other evidence that anyone in the home used or dealt in drugs. The government presented no surveillance or recorded evidence that Hands was engaged in the drug trade, despite the fact that state investigators had cracked the Monroe County drug ring by conducting surveillance and taping drug transactions engaged in by informants. Hands did not confess to the crimes alleged in the indictment. In fact, he consistently admitted to the arresting police officer and on the witness stand that he had used marijuana and cocaine in the past, but repeatedly denied having participated in drug distribution. Only two pieces of documentary evidence presented at trial could have connected Hands to the alleged conspiracy: an entry of "E.H." in a notebook and a corresponding entry of "E." in an electronic planner, both belonging to Bill Steele, one of Hands's alleged coconspirators. On Bill Steele's cross-examination, however, defense counsel raised a doubt as to whether these notations referred to Hands.[21] Considering the scale of the drug operation alleged and the scope of the State of

---

[21]For example, Bill Steele could not explain why his electronic planner's address book, which contained the names and telephone numbers of those with whom he conducted drug transactions, contained no entry for Hands but had an entry for another drug dealer whose name began with "E." He stated that his wife had made the "E.H." entry in the notebook and admitted that he was not sure whether that entry stood for Hands.

The prosecutor's misconduct during closing arguments, discussed more fully below, also tainted this evidence with an element of error because the prosecutor improperly stated that a witness she had not called to the stand would have corroborated Bill Steele's statement that the notations stood for Hands.

Alabama's investigation, this lack of evidence could have led the jury to conclude that Hands had not been a part of the charged drug conspiracy.

The government presented some circumstantial evidence that Hands was involved in illegal activities. For example, it showed that Hands, a self-employed logger and bulldozer operator, appeared to have spent more money than he had claimed to earn on his tax returns because his house had several rooms and a chandelier, he had a driveway with a gate, and he owned several cars and pieces of logging equipment. Hands countered this evidence with testimony that, had the jury credited it, would have explained the apparent discrepancy between his standard of living and his earnings. His witnesses stated that he had inherited his land, had built the improvements on his house himself, and had ordered the chandelier from the J.C. Penney catalog; he also claimed that most of his cars were old ones that he had repaired. He conceded that he had not reported all of his income from his businesses to the tax authorities. Furthermore, Hands's lifestyle, although more comfortable than his tax returns might have suggested, was less lavish than the jury might have expected in light of the multimillion-dollar drug trade that the government had attributed to him. In sum, Hands's standard of living does not constitute overwhelming evidence that he was a major drug dealer.

The backbone of the government's case on Count One, the conspiracy count,

was the testimony of eight people.[22]  Each testified that he had been involved in cocaine, crack, or marijuana transactions with Hands.  Despite the overall quantity of testimony, the jury reasonably could have concluded that Hands had not participated in the charged conspiracy.  Each witness's credibility was highly questionable.[23] Each had pled guilty to narcotics offenses, and each testified in the hope of receiving a reduced sentence or reduced charges; Hands presented evidence that several of the most important witnesses had poor reputations for veracity.  The government was unable to bolster the witnesses' credibility with independent corroborating evidence.  The witnesses also did not corroborate one another's testimony to a significant extent.  Although all of them made the same general point—that Hands had bought or sold various drugs—few of them testified about the same details, and many gave widely differing accounts of such topics as Hands's drug distribution techniques and their drug transactions with one another.

On Count Two, the distribution and possession count, the government relied

---

[22]Two other government witnesses testified that on one or two occasions they had shared cocaine with Hands during social gatherings.  This testimony was consistent with Hands's own claim—that he was a recreational drug user but not a drug dealer.

[23]Harmless error review, unlike a determination of the sufficiency of the evidence, does not require us to view witnesses' credibility in the light most favorable to the government.  See Marshall, 173 F.3d at 1318 n.15; see also United States v. Scroger, 98 F.3d 1256, 1261 (10th Cir. 1996) ("In conducting a harmless error review, we review the record de novo.").

even more heavily on testimony of questionable veracity than it did on Count One. After Ricky Parrish, who had been arrested, decided to cooperate with the authorities, he led police to a place on his property where he stored 1½ ounces of cocaine. Although Parrish had several cocaine suppliers, he claimed that he had purchased that particular cocaine from Hands on credit. Parrish hoped to receive a reduced sentence as a result of his testimony; like all of the prosecution's main witnesses, he therefore had an incentive to lie about the source of the drugs. Physical evidence did not corroborate Parrish's testimony (although Parrish stated that Hands had handled the plastic bag containing the cocaine, the government introduced no fingerprint evidence). The jury also could have found his testimony questionable in light of his other testimony that his practice was to buy much smaller amounts of cocaine from Hands (3½ grams every two or three weeks).

We do not suggest that a jury may not convict a defendant based upon testimony that is given in exchange for favorable treatment by the prosecution. If a jury finds it credible, testimony such as that heard in this case will be sufficient to support a conviction. When we assess the strength of the government's case for purposes of harmless error analysis, however, we may take into account factors—such as incentives to lie—that would have affected the jury's assessment of a witness's testimony. In Marshall, for example, the government, in a prosecution for possession

of crack cocaine, relied primarily on the testimony of a police informant who claimed to have purchased crack from the defendants. See Marshall, 173 F.3d at 1316. The government also produced "substantial circumstantial evidence" far more convincing than that found in the case before us: "the defendants had large sums of cash (including the recorded bills used by [the informant in conducting the drug transaction]) and lived in a trailer filled with items used in crack production." Id. Although we noted that the government informant's "testimony, if believed, would be more than sufficient to sustain Marshall's convictions," id. at 1318 n.15, we vacated the defendants' convictions, reasoning that because the chief witness was "an informant of questionable credibility," id. at 1316, two evidentiary errors could improperly have swayed the jury. See also United States v. Blakey, 14 F.3d 1557, 1561 (11th Cir. 1994) (holding that evidence, consisting of the testimony of three witnesses who each had "motives to lie," was "not overwhelming," and that prosecutorial misconduct therefore was not harmless error); United States v. Beale, 921 F.2d 1412, 1425 (11th Cir. 1991) (holding erroneous admission of evidence not harmless beyond a reasonable doubt where the only other evidence against defendant was the uncorroborated testimony of a cooperating witness of "questionable credibility").

The government's case against Hands contained weaknesses similar to those

19

identified in Marshall: the direct evidence consisted entirely of the testimony of witnesses of highly questionable credibility, and the circumstantial evidence was far less convincing than the Marshall circumstantial evidence. Hands's case turned entirely upon which biased witnesses the jury chose to believe. Evidence that tended to erode Hands's credibility and to prejudice the jury against him, therefore, could have had a substantial—perhaps overpowering—impact on the jury's deliberations. See United States v. Crutchfield, 26 F.3d 1098, 1103 (11th Cir. 1994) (reversing conviction on grounds of prosecutorial misconduct where "[t]he prejudicial effect of [the] misconduct cannot be disputed, as this case turned largely on the jury's credibility determinations of the several witnesses who testified"); see also United States v. Sanchez, 176 F.3d 1214, 1218 (9th Cir. 1999) (holding that the cumulative effect of several incidents of prosecutorial misconduct that undercut defendant's credibility was not harmless error; noting that defendant, to go free, needed to persuade jury that he was credible and that the prosecution witnesses, who testified in exchange for leniency, were not); United States v. Watson, 171 F.3d 695, 700-01 (D.C. Cir. 1999) (no harmless error where "credibility was key"); United States v. Manning, 23 F.3d 570, 575 (1st Cir. 1994) (finding error not harmless and vacating conviction on grounds of prosecutorial misconduct that "significantly interfered with the jury's ability to make an essential and liminal credibility determination").

Having determined that the prosecution's case was not overwhelming, we assess the potential impact of the improperly admitted evidence. As discussed above, the evidence was highly prejudicial. The testimony the prosecutor elicited from Hands demonstrated that Hands had beaten his wife, an offense that was likely to anger the jurors and could have impelled them to render an adverse verdict in order to punish Hands. During her closing argument, the prosecutor reminded the jury that Hands had beaten his wife "severely."[24] See Marshall, 173 F.3d at 1318 (noting that "potential prejudice was exacerbated by the Government's use of the [improperly admitted] evidence in its closing argument"). The photographs served as a graphic and unforgettable illustration of the abuse, which remained in the jury's possession throughout its deliberations. The district court did not give a limiting instruction regarding the evidence, a step that could have diminished its prejudicial impact. Cf. United States v. Trujillo, 146 F.3d 838, 844 (11th Cir. 1998); United States v. Eubanks, 876 F.2d 1514, 1517 (11th Cir. 1989) (per curiam). The course of the jury's deliberations and its verdicts do not suggest that it was able to ignore the prejudicial evidence. The jury found Hands guilty on all substantive counts, then determined that Hands should forfeit the maximum amount of money listed in the forfeiture count,

---

[24]Trial Tr., R11 at 861.

21

despite the fact that it had sent a note indicating that it might not have understood the meaning of the forfeiture provision.[25]  Cf. Mills, 138 F.3d at 936 (noting that not-guilty verdict on most counts "implies that the jury's consideration was not tainted by [improperly admitted] evidence"); Church, 955 F.2d at 703 (same); United States v. Gonzalez, 940 F.2d 1413, 1421 (11th Cir. 1991) (same).

When assessing the effect of the evidentiary error upon the case as a whole, we also must consider the prosecutor's closing argument.  The prosecutor conducted the argument in such an overzealous manner that the government itself, at oral argument, conceded that her behavior was "wrong."  First, the prosecutor deliberately and repeatedly used inflammatory language to describe Hands.  She opened the statement with the words, "There is an extremely wicked and vicious drug dealer in the courtroom today,"[26] and continued in this vein for the entire argument.  For example, she told the jury that Hands was a "wicked, vicious . . . six foot five, 250-pound

---

[25]The indictment alleged that several pieces of real property, as well as cash, were forfeitable. The jury deliberated on the forfeiture charges for 45 minutes, then sent a note asking for an explanation of the sixth item on the list of forfeitable items, "$725,000 in proceeds." The trial judge told the attorneys, "I don't understand [number six] myself. . . . It's unintelligible." Trial Tr., R11 at 947.  The court then determined that the government had not offered sufficient proof that Hands owned any of the real property that constituted the first five items on the list; it therefore instructed the jury to consider only whether any amount between zero and $725,000 in proceeds was forfeitable.  After ten minutes, the jury returned with a verdict of forfeiture of the full $725,000.

[26]Trial Tr., R11 at 852.

22

monster";[27] a "wickedly vicious man, monster, drug dealer";[28] and a "big, vicious, wicked, manipulating, cold-hearted, money-driven maniac."[29]  Pretending to use Hands's words, she said, "I am Monroe County's resident kingpin drug-dealing monster and you don't mess with me."[30] The prosecutor's choice of words clearly was no accident.  Ten of the fourteen pages of the closing statement transcript contain multiple repetitions of the words "monster," "vicious," "wicked," and "maniac." These statements were improper because they were "calculated to inflame [the] jury," United States v. Boyd, 131 F.3d 951, 955 n.4 (11th Cir. 1997) (per curiam), cert. denied, __ U.S. __, 119 S. Ct. 211 (1998), and to persuade the jurors to render a decision based on their emotional response to Hands's behavior, rather than the evidence introduced at trial, see United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997).  The prosecutor's words, among "the last . . . spoken to the jury by the trial attorneys," Manning, 23 F.3d at 575, invited the jury to convict for the wrong reasons.

> This type of shorthand characterization of an accused, not based on evidence, is especially likely to stick in the minds of the jury and

---

[27]Id. at 854.

[28]Id. at 858.

[29]Id. at 863.

[30]Id. at 860.  There was no evidence that Hands had engaged in this type of bragging.

influence its deliberations. Out of the usual welter of grey facts it starkly rises—succinct, pithy, colorful, and expressed in a sharp break with the decorum which the citizen expects from the representative of his government.

Blakey, 14 F.3d at 1561 (quoting Hall v. United States, 419 F.2d 582, 587 (5th Cir. 1969)).[31]

Second, the prosecutor misstated the evidence in several ways. For example, she stated that when she asked Hands whether he had beaten his wife, he answered "Yeah," then changed his story and claimed that they had had a "tussle."[32] In fact, Hands never admitted that he had beaten Doris Hands. "It is a fundamental tenet of the law that attorneys may not make material misstatements of fact in summation." Davis v. Zant, 36 F.3d 1538, 1548 n.15 (11th Cir. 1994) (noting prosecutors' "special duty of integrity in their arguments"). Although none of the prosecutor's misstatements misled the jury on a critical point of the government's case, cf. Watson, 171 F.3d at 700, and although the district court limited the impact of these statements to some extent by instructing the jury that the attorneys' arguments were not to be

---

[31]The government informed us at oral argument that the prosecutor's superiors have reprimanded her for her conduct. We applaud the U.S. Attorney's office's willingness to acknowledge its mistakes, and encourage it to strive to prevent such overzealousness in the future. The office's present efforts, however, cannot reverse the effect of the misconduct on the fairness of Hands's trial.

[32]Trial Tr., R11 at 861.

24

taken as evidence, see Wilson, 149 F.3d at 1302, these remarks constitute another unfortunate lapse of judgment on the part of the prosecutor.

Finally, the prosecutor improperly told the jury that an uncalled witness would have corroborated another witness's testimony on an important point. During her opening statement, the prosecutor told the jury that she planned to call Darlene Steele, Bill Steele's wife, to the stand, and stated that Darlene Steele had pled guilty to drug dealing charges. In its examination of Bill Steele, the government introduced into evidence Bill Steele's electronic organizer, which contained a reference to a transaction with "E.," and a sheet of paper in Darlene Steele's handwriting containing a corresponding reference to a transaction with "E.H." Bill Steele initially claimed that these notes referred to Hands, but admitted that he did not know what his wife meant when she made the handwritten notation.[33] The government did not call Darlene Steele to testify. During her rebuttal argument, the prosecutor stated,

> During the course of the trial, I made a decision not to put Darlene on because what was Darlene going to say? She was going to echo what her husband, Bill, said. What was her purpose in testifying? That's my note.

> Now, Bill wrote the exact same thing in his electronic organizer. What she did is keep her own records and that corroborated it. I made a decision not to call Darlene because what she would have said was

---

[33]See Trial Tr., R8 at 440.

25

already in evidence.[34]

A prosecutor ordinarily acts improperly if she attempts to bolster testimony by vouching for a witness's credibility.

> Such attempts are <u>indeed</u> improper if the jury could reasonably believe that the prosecutor indicated a personal belief in the witness' credibility. A jury could reasonably believe the prosecutor's indications if . . . the prosecutor implicitly vouches for the witness' veracity by indicating that information not presented to the jury supports the testimony.

<u>United States v. Eyster</u>, 948 F.2d 1196, 1206 (11th Cir. 1991) (citations omitted); <u>see also</u> <u>United States v. Martinez</u>, 96 F.3d 473, 476 (11th Cir. 1996) ("[A]rgument to the jury must be based solely on the evidence admitted at trial."). The prosecutor's statement that Darlene Steele's testimony would have "corroborated" Bill Steele's was an improper attempt to bolster Bill Steele's credibility. This attempt was especially likely to affect the verdict because the jury could have found the cryptic references to "E." and "E.H." to be the most convincing pieces of evidence against Hands.

Hands's counsel did not draw the trial court's attention to the prosecutor's misconduct by objecting. Were the misconduct the only issue before us, we therefore would review it for plain error, and would reverse only if we determined that the misconduct was "so obvious that failure to correct it would jeopardize the fairness and

---

[34]Trial Tr., R11 at 897. <u>See also</u> <u>id.</u> at 865 (prosecutor's statement that Darlene Steele's notes corroborated Bill Steele's statement).

26

integrity of the trial," <u>Bailey</u>, 123 F.3d at 1400. We do not proceed to this inquiry, however, because we assess not the prosecutorial misconduct alone, but the combined impact of the errors on the verdict. <u>See</u> <u>United States v. Labarbera</u>, 581 F.2d 107, 110 (5th Cir. 1978) (holding that "cumulative effect of [multiple] errors" worked to deprive defendant of fair trial, although some errors, standing alone, would be subject to plain error review and others might be harmless); <u>Sanchez</u>, 176 F.3d at 1220, 1225 (not resolving plain error question where cumulative effect of errors compelled reversal); <u>cf.</u> <u>United States v. McLain</u>, 823 F.2d 1457, 1462 (11th Cir. 1987) (holding that although prosecutorial misconduct alone would not have merited reversal, "the cumulative effect of the errors committed by the judge and the prosecutor . . . denied the defendants a fair trial"). The elements of this case—the introduction of highly inflammatory, irrelevant evidence; the nature of the government's case, which depended on the jury's assessment of the relative credibility of the prosecution and defense witnesses; and the additional prejudice created by the prosecutor's misconduct—add up to a conclusion that the improper admission of evidence was not harmless error.

## CONCLUSION

For the foregoing reasons, we REVERSE and REMAND to the district court for further proceedings in accordance with this opinion.