[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELVENTH CIRCUIT

_____

No. 14-15541

_____

D.C. Docket No. 1:12-cr-20592-CMA-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANDRES CAMPO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 1, 2016)

Before HULL, MARTIN, and BALDOCK[*], Circuit Judges.

BALDOCK, Circuit Judge:

_____

[*] Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

A jury convicted Defendant Andres Campo on four counts related to the murder of Erik Comesana, six counts related to a firearm trafficking scheme, and two counts related to possessing a firearm or ammunition while a fugitive from justice. On appeal, Campo argues that there was insufficient evidence to convict him on all four counts related to the murder and one of the six counts related to the firearm trafficking scheme. He also challenges the admission of testimony from the murder victim's brother, alleges ineffective assistance of counsel, and argues that the imposition of sentences on two of the murder counts violated the Double Jeopardy Clause of the Fifth Amendment. For the reasons set forth below, we affirm Campo's convictions and sentences but decline to consider his ineffective assistance of counsel claim.

## I. Facts

Because Campo challenges several of his convictions on sufficiency of the evidence grounds, we set forth in detail the facts a reasonable jury could find from the evidence presented at trial, taking the evidence in the light most favorable to the government and drawing all reasonable inferences in support of the jury's verdicts. *See United States v. Doe,* 661 F.3d 550, 560 (11th Cir. 2011) (setting forth the standard of review for sufficiency of the evidence challenges).

### A. Arms trafficking scheme

Between 2008 and his arrest in July 2012, Campo led an international arms trafficking organization based in Miami, Florida.  Campo hired people to act as straw purchasers who would obtain firearms and firearm parts in their own names and transfer them to him.  Campo's workers would also disassemble the firearms and firearms parts into smaller pieces; conceal them within innocuous looking items such as barbeque grills, sawhorses, work lights, and lawn chairs; and reseal the items to make them appear new.  Campo's workers completed this work at various locations in Miami, including a warehouse at 4283 SW 75th Avenue, where they would paint individual pieces to better disguise them; a warehouse approximately five blocks away at 4606 SW 75th Avenue, where they would disassemble and package the parts; and a garage at 340 NW 132nd Avenue.  Using addresses Campo provided, Campo's employees would then ship the items to Colombia using commercial airlines such as Avianca Express.  Campo's associates in Colombia reconstructed the pieces into operational firearms and sold them for profit to Colombian rebels.

3

## B. Erik Comesana's role in the organization

In 2009, Erik[1] worked for Campo purchasing firearms and packaging them for shipment to Colombia. In October 2009, Erik and Michael Romero went to the Florida Gun Exchange in Port Orange, Florida, with money from Campo to purchase AR-15 lower receivers, the portion technically considered the firearm. While Erik waited in the car, Romero entered the store and attempted to purchase seven lower receivers. An ATF agent who was working undercover as a new salesman spoke with Romero and suspected he was conducting a straw purchase. After the agent identified himself as an ATF agent, Romero admitted he was buying the lower receivers for "a guy named Campos [sic]," R. 330 at 165:18,[2] and that the person who was going to transfer the guns to the real buyer was sitting outside in the car. Another officer then brought Erik into the store. Erik admitted to making straw purchases and made a handwritten affidavit stating that "Andres Campos [sic] gave me money to buy guns with Mike Romero" to purchase and bring back to him. R. 330 at 172:2-4; Trial Ex. 32. The agent allowed Erik and Romero to leave without arresting them in the hopes that they would cooperate and help set up a sting operation to catch Campo. The agent instructed Erik to give Campo an excuse as to why he could not purchase the firearms so they could

---

[1] Because we discuss both Erik and his brother Kristian Comesana, we refer to Erik and Kristian by their first names.

[2] References to the record refer to the district court docket number followed by the page and line numbers of the trial transcript.

4

complete the sting operation at a later date, but when Campo called Erik and asked about the purchase, Erik told him "something to the effect of, [t]he cops nabbed me," and Campo hung up the phone. R. 330 at 180:18–19. Although Erik called the agent periodically over the next few weeks, the agent realized Erik was not going to be forthcoming with information and would not cooperate.

### C. Erik's arrest

In March 2011, ATF agents arrested Erik on gun trafficking charges. Erik was released on bond pending trial. As part of Erik's conditions on release, Erik had a curfew of 8 p.m. and had to wear an ankle bracelet so probation could monitor his movements. Erik's brother Kristian Comesana, who also worked for Campo, called Campo to let him know that Erik had been arrested. Campo "seemed kind of distraught," R. 331 at 83:2, and told Kristian that he would cover Erik's legal fees. Campo wanted to see a copy of Erik's arrest paperwork, which Kristian provided to him. Campo became upset when he saw his name— "Campos"—specifically mentioned in Erik's criminal complaint. Trial Ex. 117 at 5 (stating, in the agent's affidavit attached to Erik's criminal complaint, that "Romero said Comesana had provided him the money to buy the guns and that Comesana intended to transfer the guns to a third person named 'Campos'"). Campo sent his employee Crisanto Diego Trejos-Ortiz with Erik to find an attorney and provided $4,000, which covered a portion of the lawyer's fee.

Even though Campo was willing to pay for Erik's attorney, their relationship changed after Erik was arrested and released pending trial—the two fought about money, Campo would only talk to Erik through a temporary phone that Campo provided to Kristian (a "burner phone"), and Campo became increasingly nervous that Erik would reveal the firearm trafficking scheme to authorities. Campo told Kristian to relay messages to Erik, including that Erik "better not snitch," R. 331 at 87:9, and that "he [Campo] knows people from Colombia that would take care of him [Erik]," R. 331 at 123:25–124:1. On one occasion, Campo called Kristian and was "flipping out," thinking that Erik would "snitch." R. 331 at 200:18–19. Erik spoke to Campo to calm him down and assure him that he would not reveal Campo's business. Erik also repeatedly asked Campo for the remaining money for his attorney's fees. At one point, he told Campo over Kristian's burner phone:

> I'm going to jail for you. Like, I need this money. I am going to jail.
> I am doing time for you. They showed me a picture of you and I told
> them that I haven't seen -- like, I haven't seen you, I haven't talked to
> you, like, I don't know you.

R. 331 at 199:13–17. David Loaiza, one of Campo's employees, heard Erik "demanding that he needed $10,000 to pay the lawyer," R. 333 at 73:21–22, and Campo directing Trejos-Ortiz to tell Erik to "stop whining and bitching and crying," R. 333 at 73:24–25. Campo also said that "if he [Erik] snitches on me, he better watch out because once I get out, if I have to do three to five years, I will do it. And once I get out, he -- I am going to get him, he's going to get his." R. 333

6

at 74:13–17.  Julio Rodriguez, another of Campo's employees, knew that Campo was upset that his name was mentioned in Erik's complaint.  Campo explained to Rodriguez that he had moved part of his firearms trafficking operations because "Erik was trying to extortion [sic] him, asking for money to keep quiet and not to snitch him to the authority."  R. 332 at 167:17–19.  Campo then said, "I am going to kill this guy.  He want -- He not going to extortion [sic] me, I don't want to pay that kind of money he asking for [sic]."  R. 332 at 168:3–5.  Rodriguez suggested Campo should handle the situation differently, but Campo did not respond.

### D. Events of May 27, 2011

On May 27, 2011, there was a public notice on Erik's criminal docket sheet that Erik intended to change his plea at a hearing set for June 2011.  That morning, Campo and his employee Carlos Rios left their house together in Campo's black Range Rover.  That afternoon, Campo told Kristian that he had the rest of Erik's money for the lawyer and that he wanted Erik to pick up the money at the 4283 warehouse.  Per Campo's instructions, Kristian relayed the message to Erik and told Erik to wait at a bar around the corner from the warehouse.  After receiving word from Campo that he was at the warehouse, Kristian called Erik to tell him to meet Campo at the warehouse.  Erik responded, "All right."  R. 331 at 94:13.

After half an hour to an hour, Kristian began to get worried that he had not heard from Erik.  Kristian called Erik's phone and sent text messages, but Erik

never responded. When Kristian called Campo, Campo said that he (Campo) had been waiting at the warehouse but that Erik hadn't arrived. Campo also directed Kristian to tell Erik to "hurry up, because I am not going to be here all day." R. 331 at 96:12–13. When Erik still did not respond to Kristian's calls and texts, Kristian called Campo again, who sounded angry that Erik had not shown up but directed Kristian to go to the garage at 340 NW 132nd Avenue to package some firearm parts inside a sawhorse. Kristian drove to the garage but did not go inside, waited until close to 8 p.m.—Erik's curfew—and then went home. When he saw that Erik was not yet home and learned that Erik's girlfriend Genevieve LaFontaine had also been trying unsuccessfully to contact Erik, Kristian retrieved Erik's pistol from the attic and brought LaFontaine and two friends to go to the warehouse where Campo had been waiting for Erik. LaFontaine had a GPS application on her phone that connected to Erik's phone, and she was able to identify that Erik's phone was near the 4283 warehouse.

After getting a key from the 4606 warehouse, Kristian went to the warehouse at 4283 SW 75th Ave. Kristian opened the warehouse door, turned on the lights, saw "a whole bunch of blood on the floor," and immediately thought that Campo had "killed my brother." R. 331 at 102:10–12. Kristian panicked and ran back to the car, leaving the warehouse door open and lights on, and told LaFontaine to call the police. He attempted to drive away but went the wrong

8

direction, turned around, and drove past the warehouse again. He saw what he identified as Campo's vehicle—the black Range Rover—pull up to the warehouse and saw Rios get out of the passenger side. Kristian drove away and LaFontaine called 9-1-1 at 9:03 p.m. Kristian told the 9-1-1 dispatcher that he had seen blood in the warehouse and that his brother had been killed. Kristian continued: "Listen to me. Listen to me, okay. I know who killed him. I know who killed him. His name is Andres Campo." R. 331 at 111:24–112:1. The dispatcher told them to wait at a nearby Wendy's. Kristian drove to the Wendy's and waited but then drove away when he saw what he thought was Campo's vehicle pull into the Wendy's parking lot. Kristian saw that his burner phone was ringing, but he "freaked out" and threw it out the window. R. 331 at 103:17. Still upset, Kristian drove away and ended up behind a university. There, he spoke with police officers and explained that he thought he had been followed by "the people that killed my brother." R. 331 at 115:24–116:2.

Around the time Campo had sent Kristian to the garage to finish packing a sawhorse, he told Rodriguez to come to the warehouse to pick up a box of parts to take to the garage. When Rodriguez reported to the warehouse around 7:30 p.m., Trejos-Ortiz was at the warehouse door and would not let him enter. Rodriguez saw Campo inside the warehouse wearing dishwashing gloves with a bottle that he thought was bleach or another cleaner. Campo told him, "Don't get in here, I'm

9

doing some surgery." R. 332 at 172:23. Rodriguez then believed that Campo had "carried out the threat" he had made against Erik. R. 332 at 174:2–3. Later that night around 11:30 p.m. or later, Loaiza met with Trejos-Ortiz in Sunny Isles. Trejos-Ortiz had two white bags with him, one with two pistols inside. He directed Loaiza where to drive so that he could dispose of the bags, other papers from his apartment, and a GPS unit. Because Trejos-Ortiz and Loaiza had exchanged vehicles that morning, Trejos-Ortiz then directed Loaiza to drive to the 4283 warehouse to pick up Loaiza's vehicle. When they approached the warehouse, they saw yellow tape around the warehouse and a lot of policemen in the area. Trejos-Ortiz spoke to Campo on the phone and said, "I knew we shouldn't -- we shouldn't have done it this way." R. 333 at 86:16–17.

After Kristian reported what he believed to be his brother's murder to police officers, officers entered the warehouse, saw a large amount of blood smeared on the floor, and smelled a strong scent of bleach. They saw tables set up, equipment related to firearms, plastic buckets, a mop, bottles of bleach, gloves, and a fast food bag. After a more thorough search, officers also found, among other things, bloody gloves, clothing that had what appeared to be bullet holes, a filet knife, a machete, two spent casings, and two projectiles.[3] Around 10:18 p.m., firefighters received a call regarding a fire in rural Miami-Dade County. After they

---

[3] A round of ammunition is made up of four parts: (1) the casing; (2) the gun powder; (3) the primer, an explosive material at the rear of the casing; and (4) the projectile, or bullet.

10

extinguished the large fire, the firefighters found Erik's badly burned body tied with an extension cord and wrapped in plastic. The autopsy revealed that Erik had been shot twice and had a blunt force trauma to the back right side of his head.

At 10:25 p.m., Campo, nervous and scared, called his mother Gloria Zapata. He told her, "Mom, something bad has happened, something bad has happened and I have to leave." Trial Ex. 454 at 19:5–11. He did not explain what happened or where he was going. Around 11 p.m., Campo and Rios returned to their home and asked Sharon Mendoza, Campo's girlfriend, to go on a trip with them that night to Orlando. After they packed, they left in Mendoza's red Mercedes, which Campo had purchased for her. While they were driving, Campo threw out his cell phone and otherwise limited the information he shared with Mendoza. *See* R. 332 at 130:22–131:4 ("Q. [D]id you ask Andres, hey, what's going on? A. Uh-huh. Q. What did Andres answer? A. That the least [sic] I knew was better. Q. Was it what you said before, The less I knew, the longer I lived? A. It's the same."). Campo, Rios, and Mendoza went to Orlando and then New York for some time before returning to Florida.

### E. Campo talks about Erik's murder

By late 2011, Campo had returned to Florida, resumed his international firearms trafficking operation, and hired a new employee, Jose Torres. In March 2012, he returned to Miami. One day while Campo, Rios, and Torres were driving,

11

they saw a bush fire.  Torres said, "That bush fire is pretty big."  R. 330 at 23:2.

Campo and Rios looked at each other and smirked, and Campo said "Erik's fire

was bigger."  R. 330 at 23:3.  At that point, Torres did not know who Erik was.  On

more than five occasions, Campo recounted to Torres how and why he killed Erik.

Campo explained that Erik was a friend that had been "informing to the ATF."  R.

330 at 24:1.  Campo's plan had been to get Erik to the warehouse to kill him.

When Erik was at the warehouse, Campo received a call from his girlfriend and,

during the conversation, Erik said, "Instead of buying your girlfriend a Mercedes,

you should have given me the money to keep my mouth closed."  R. 330 at 25:7–9.

Campo then pulled out his gun and fired three to four times, but the gun jammed.

Some of the bullets hit Erik and he fell to the ground, and Rios then hit him twice

in the head with a monkey wrench.  Campo felt that Erik was still alive, and so he

grabbed a filet knife and decapitated Erik.  Campo and Rios also cut off Erik's foot

with a machete to remove the GPS tracker he had while on house arrest.  Campo

and Rios then wrapped up Erik's body and went to Home Depot to pick up cement.

They had planned to wrap the body with cement to weigh it down and throw it in a

lake, but they had to alter their plan when Erik's brother entered the warehouse and

saw Erik wrapped in plastic.  The brother ran out, called the police, and then called

Campo and said, "I called the police on you, please don't kill me, please don't kill

me."  R. 330 at 26:18–19.  Campo and Rios then loaded the victim into the back of

12

a white pickup, drove to a grassy field, doused the body with gasoline, and set it on fire. Campo picked up his girlfriend and fled with Rios to New York. On one occasion when Campo told Torres this story outside of Rios' presence, Campo said that Rios picked up a shell casing without fingerprinting and threw it in the garbage. Campo was concerned that might be evidence for them to get caught.[4]

### F. Arrest of Campo and Rios

On July 26, 2012, ATF agents waited for Campo and Rios in the parking lot of a Motel 6 in Cutler Bay in Miami-Dade County. They saw Campo walk to a Nissan Altima and open the left-rear passenger door while Rios walked to the front passenger seat. Officers arrested Campo and chased down and arrested Rios. As Campo was arrested, he said, "You finally got me." R. 333 at 178:12–13. In searching the car, officers found a loaded Taurus revolver with a wooden handle inside the vehicle, additional ammunition, several cell phones, a firearms textbook and catalog, calling cards to Colombia, a list of Avianca Express locations, a list reading "twenty-five 80 percent," R. 330 at 123:6, and a note that said, "Tomorrow, Home Depot, get three sawhorses," R. 330 at 123:18. In the trunk, officers found an AR-15 upper receiver.

---

[4] Evidence at trial demonstrated that parts of Campo's alleged confession to Torres were false. The autopsy indicated that Erik's head and foot were intact and Erik's body did not have any signs of deep cuts. Kristian's testimony also conflicts with parts of Campo's alleged confession. Kristian testified that he saw only blood in the warehouse and did not see his brother. He also testified that when he saw Campo was trying to call his burner phone, he threw the phone out of the window rather than talking to Campo.

## II. Procedural History

A federal grand jury indicted Campo on 12 counts. Counts 1–4 related to the murder, Counts 5–9 and 11 related to the trafficking scheme, and Counts 10 and 12 related to Campo's possession of firearms and ammunition as a fugitive. At trial, the government elicited testimony from a number of Campo's former employees, including Kristian, Romero, Rodriguez, Loaiza, and Torres. Erik's girlfriend LaFontaine and Campo's girlfriend Mendoza also testified, and the government introduced sworn testimony from Campo's mother Zapata. The government also presented evidence regarding cell phone records, fingerprint evidence, ballistics results, and DNA evidence. Campo cross-examined many witnesses but did not present any evidence or call any witnesses.

Campo moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a), which the district court denied. The jury convicted Campo on all counts except for part of Count 3 that would have led to a higher mandatory minimum sentence on that count. Campo moved for a new trial under Federal Rule of Criminal Procedure 33 alleging ineffective assistance of counsel and insufficient evidence on Counts 1–4 and Count 11. The district court denied that motion, as well. The district court sentenced Campo to concurrent life sentences on Counts 1, 2, and 4, a consecutive 120-month term on Count 3, a concurrent 60-month term on Count 5, and concurrent 120-month terms on Counts 6–12. Campo

14

now appeals, arguing that there was insufficient evidence on multiple counts, that the district court erred in permitting "lay opinion" testimony from Kristian, and that the district court violated his Fifth Amendment right against Double Jeopardy when it sentenced him on both Counts 3 and 4.[5]

## III. Discussion

### A. Insufficiency of the Evidence

Campo contends that, because the evidence was insufficient for a reasonable jury to convict him on counts 1–4 and count 11, the district court erred in denying his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(a).  "We review *de novo* whether there is sufficient evidence to support a jury's verdict in a criminal trial."  *United States v. Doe,* 661 F.3d at 560.  In performing this review, we view the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility determinations in favor of the jury's verdict.  *Id.*  Evidence is sufficient to support a conviction if a reasonable jury could find that the evidence established guilt beyond a reasonable doubt.

---

[5] Campo also argues on appeal that he received constitutionally deficient representation during trial and, thus, the district court erred in denying his motion for a new trial.  Although the district court considered Campo's ineffective assistance of counsel claim and denied it, we find that the record is insufficiently developed on the claim and decline to review the claim at this juncture.  "The preferred means for deciding a claim of ineffective assistance of counsel is through a 28 U.S.C. § 2255 motion 'even if the record contains some indication of deficiencies in counsel's performance.'"  *United States v. Patterson*, 595 F.3d 1324, 1328–29 (11th Cir. 2010) (quoting *Massaro v. United States*, 538 U.S. 500, 504, 123 S. Ct. 1690, 1694 (2003)).  We do not suggest that Campo's counsel was ineffective, but Campo may raise his claim in a 28 U.S.C. § 2255 motion if he so chooses and timely files it.

*United States v. Beckles,* 565 F.3d 832, 840 (11th Cir. 2009). We will not vacate a conviction on sufficiency of the evidence grounds when a defendant does nothing more than "put forth a reasonable hypothesis of innocence," because "the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *Id.* at 840–41 (citation and internal quotation marks omitted).

### 1. Counts 1–4

Campo challenges the sufficiency of the evidence for Counts 1–4 relating to Erik's murder. Count 1was a conspiracy count that alleged Campo, in violation of 18 U.S.C. § 1512(a)(1)(C) and § 1512(k), conspired with Rios and other persons to kill Erik with the intent to prevent Erik from communicating with a law enforcement officer regarding the commission of a federal offense, and that the killing was first degree murder. Count 2 was the substantive count that Campo murdered Erik to prevent him from communicating with a law enforcement officer regarding a federal offense in violation of 18 U.S.C. § 1512(a)(1)(C). Counts 3 and 4 charged Campo with knowingly carrying and using a firearm during and in relation to a crime of violence. Count 3 alleged that the firearm was discharged in violation of 18 U.S.C. § 924(c)(1)(A)(iii), and Count 4 charged that Campo's use of a firearm resulted in death, in violation of 18 U.S.C. § 924(j). We have thoroughly reviewed the record and conclude that, despite Campo's best attempts

16

to cast doubt on the evidence, the evidence against him was overwhelming and the jury reasonably found Campo guilty on all four counts beyond a reasonable doubt.

First, there is sufficient evidence to support the jury's verdict that Campo conspired with at least one other person to kill Erik. "To support a conspiracy conviction, the government must prove (1) an agreement between the defendant and one or more persons, (2) the object of which is to do either an unlawful act or a lawful act by unlawful means." *United States v. Smith*, 289 F.3d 696, 706 (11th Cir. 2002) (citation and internal quotation marks omitted). To prove participation in a conspiracy, the government must prove beyond a reasonable doubt, even if only by circumstantial evidence, that a conspiracy existed and that the defendant knowingly and voluntarily joined the conspiracy. *United States v. Charles*, 313 F.3d 1278, 1284 (11th Cir. 2002). "[B]ecause the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements." *United States v. Pineiro*, 389 F.3d 1359, 1369 (11th Cir.2004) (citation and internal quotation marks omitted).

Count 1 alleged that Campo conspired specifically with Rios to kill Erik. Some of the evidence to support the jury's finding on this count is as follows: Mendoza, Campo's girlfriend who lived with Campo and Rios, testified that Campo and Rios left together on the morning of May 27, 2011, in Campo's black Range Rover. Physical evidence shows that Campo and Rios were together at the

17

warehouse a few hours before Erik was killed there—officers found a Checkers fast food bag in the warehouse along with a receipt dated 5/27/11 at 4:45 p.m. DNA from a napkin inside the bag matched Rios' DNA profile, and a piece of bread matched Campo's DNA profile.  Torres testified that when he pointed out a brush fire, both Campo and Torres smirked before Campo said, "Erik's fire was bigger."  Campo also told Torres that Rios hit Erik twice in the back of the head with a monkey wrench, which was consistent with the medical examiner's finding that Erik had a blunt force trauma on the back right of his head.  And after Kristian saw the blood in the warehouse, he saw Campo's black Range Rover arrive at the warehouse and saw Rios get out of the passenger side.  Although the government did not call Rios, the jury could rely on circumstantial evidence to find that Campo and Rios conspired together.

Other evidence would support a finding that Campo conspired with other "known and unknown persons," such as with Trejos-Ortiz.  Trejos-Ortiz was with Campo when Campo read Erik's criminal complaint, accompanied Erik to speak with an attorney so that he could keep Campo apprised of the case, communicated Campo's threats against Erik over the phone, and was present when Campo told Rodriguez that he planned to kill Erik.  Trejos-Ortiz also participated in covering up part of the crime by keeping Rodriguez out of the warehouse when Campo was inside "doing some surgery"—that is, cleaning up Erik's blood—and disposing of

what a jury could infer was evidence of the crime, including two pistols.

Rodriguez further heard Trejos-Ortiz tell Campo over the phone, "I knew we

shouldn't -- we shouldn't have done it this way," which a jury could likewise infer

was Trejos-Ortiz's admission to participating in the conspiracy to kill Erik and

helping to conceal the evidence.[6]  A reasonable jury had more than sufficient

evidence by which it could find Campo guilty beyond a reasonable doubt of

conspiring with at least one other person to kill Erik.

Next, there is overwhelming evidence that Campo intended to kill Erik to

prevent Erik from communicating with law enforcement about Campo's firearm

trafficking scheme.  Kristian and Rodriguez testified that Campo was upset that his

name was mentioned in Erik's complaint.  Kristian, Rodriguez, and Loaiza heard

Campo either directly or indirectly warn Erik not to "snitch" and that there would

be consequences if he did.  Campo warned that people from Colombia "would take

care of" Erik, which Kristian understood to be a threat against Erik's life.  Loaiza

heard Campo say that Erik "better watch out because once I [Campo] get out, if I

have to do three to five years, I will do it.  And once I get out, he -- I am going to

get him, he's going to get his."  And Campo told Rodriguez directly that he would

---

[6] This is not to say the evidence establishes that Trejos-Ortiz killed Erik.  Despite Campo's best efforts to pin the murder on Trejos-Ortiz, the evidence points more convincingly to Campo as the murderer, consistent with the jury's verdict.  Cell phone records for a phone the government connected to Trejos-Ortiz show that he was in the area of his residence from 5:56 p.m. until 7:00 p.m.  Cell phone records also are consistent with Rodriguez's testimony that Trejos-Ortiz arrived at the warehouse roughly the same time as Rodriguez around 7:30 p.m., when Rodriguez saw Campo cleaning up Erik's blood.

19

kill Erik for threatening to extort him.  Perhaps most damning is Torres' testimony.  Although Torres never met Erik and had no reason to know details of his death, Campo repeatedly retold Torres the story of how he killed Erik, a friend "that was informing to the ATF."  Campo said "his plan was to get Erik to the warehouse to kill him" and embellished the story of how he succeeded.

Campo attempts to undermine these witnesses' testimonies, but credibility determinations belong to the jury and all reasonable inferences and credibility choices must be made in favor of the government and the jury's verdict.  *United States v. Massey*, 89 F.3d 1433, 1438 (11th Cir. 1996).  For example, Campo asserts that Torres was unbelievable because some of the details Torres described of Erik's murder were demonstrably false, such as that Campo decapitated Erik or cut off his foot with a machete.  Campo is correct that the autopsy showed Erik's head and foot intact and did not reveal any deep lacerations, but these inconsistencies do not demonstrate that Torres had to be lying.  A reasonable jury could believe that, when Campo told Torres about how he murdered Erik, he provided mostly accurate details but exaggerated some to sound even more ruthless and emphasize to this new member of his firearm trafficking business the consequences of betraying him.  Campo also attacks Torres' credibility because Torres is a convicted felon who admitted that he cooperated with the hope of reducing his sentence.  He likewise suggests that other witnesses fabricated stories

20

to receive the benefit of cooperating with the government, including Kristian, who was never charged with a crime, and Loaiza, who had already received a sentence reduction. But Campo's credibility attacks fall short. Although these witnesses had lied and committed crimes in the past, the jury could reasonably believe that they were telling the truth at trial, even if their motivation to tell the truth was self-serving.

Campo also contends there was insufficient evidence that Erik intended to communicate with law enforcement officers, but he's mistaken as to the relevant inquiry. It doesn't matter if Erik was actually planning to communicate with law enforcement; what matters is that Campo *believed* Erik was planning to do so or would be forced to do so. Erik's attorney at the time he was murdered testified that, while Erik had decided to plead guilty, he had not yet agreed to cooperate with the government. Campo, however, may not have known that. Campo could have feared that Erik would be forced to provide details of the firearm trafficking scheme when he pleaded guilty or spoke to probation regarding his sentence. And plenty of evidence suggests that Campo was scared that Erik was going to "snitch," even when Erik tried to tell Campo otherwise.

Finally on this point, Campo argues that there was insufficient evidence that he killed Erik to prevent him from snitching because there was no evidence that he sought to harm other witnesses who cooperated with the government and testified

21

against him at trial. Perhaps most pertinent is that Campo never threatened Romero, who was also arrested and charged with Erik. But Romero's testimony revealed that he was not intimately involved in Campo's organization like Erik was. Erik recruited Romero to help purchase firearms and told Romero that he was purchasing the firearms for a friend who was selling them at gun shows. Romero did not know the true details of Campo's operation and only knew Campo's name because he overheard Erik talking on the phone about "Campos." R. 330 at 209:22–24. Romero simply did not present the same threat to Campo's business that Erik did if he "snitched." While Campo did not directly threaten most witnesses, Torres testified that he was scared to tell police the full details of what he knew when he was initially arrested because Campo was "still on the streets" at that time, and it wasn't until Campo was arrested that he felt he could disclose more details against Campo. R. 330 at 46:11–16. The fact that Campo didn't threaten other witnesses who testified against him about the firearm trafficking scheme ultimately does not prove that he didn't threaten and kill Erik.

To the extent Campo challenges the evidence that he participated in murdering Erik, we again emphasize the overwhelming evidence against him. Campo threatened Erik through proxies and bragged about killing him almost a year after the fact. Numerous witnesses' testimonies and the government's

22

exhibits corroborate each other and support the jury's finding that, beyond a reasonable doubt, Campo murdered Erik.

First, the cell phone records corroborate a number of witnesses' testimonies. The cell phone records show incoming and outgoing calls, call duration, and which cell phone tower the phone was connected to when the call was initiated and terminated. Networks connected the phones to the closest towers with an unobstructed signal with ranges that varied from a half mile in heavily populated areas to ten miles in more rural areas. For instance, Erik's phone network had a range of about two miles within the more heavily populated areas of Miami, meaning that his phone could be anywhere within a couple feet to two miles away from the tower it used. The phone number that the government tied to Campo used a network that connected to towers within a half-mile radius. While the records cannot place a cell phone more precisely within that range, the government's witnesses were able to identify key locations within those ranges consistent with a phone using a particular tower. For example, Campo's phone was often using the north side of a tower at 4338 SW 74th Avenue, which was to the south of the warehouse at 4283 SW 75th Avenue and within the half mile range for that network's tower. Although witnesses could not say Campo's phone was certainly at the warehouse, a jury would certainly be justified in drawing that conclusion. For ease of explanation, we will state that cell phone records place certain phones

in the area of significant locations.  On the afternoon of May 27, cell phone records place Campo's phone in the area of the 4283 warehouse from 4:09 p.m. to 4:45 p.m.  The phone used other towers from 4:50 p.m. until 5:47 p.m., but then was again using the tower near the warehouse at 6:09 p.m.  Kristian testified that he told Erik to wait at a bar near the warehouse until Campo was ready to meet him at the warehouse, and records place Erik's cell phone in the area of La Curva, the restaurant at 4201 SW 75th Avenue, near the 4283 warehouse, from 5:06 p.m. until 6:04 p.m.  An officer also testified that, based on surveillance video from La Curva, Erik came into the restaurant at approximately 5:22 p.m., consumed a few beers, used his cell phone, and left at 6:11 p.m.[7]  Cell phone records show that Erik answered a call at 6:03 p.m. from a number the government tied to Kristian's burner phone.  The call lasted for 28 seconds, consistent with Kristian's testimony that the final time he spoke to his brother was to tell him Campo was at the warehouse waiting for him, and Erik responded, "All right."  According to the story Campo told Torres almost a year later, Erik arrived at the warehouse and, while the two were talking, Campo's girlfriend Mendoza called.  Erik then remarked that, "[i]nstead of buying your girlfriend a Mercedes, you should have

---

[7] At the time the officer viewed the video, the time stamp on the video was off by an hour and five minutes.  The officer adjusted the time to conclude Erik entered the restaurant at 5:22 p.m. and left at 6:11 p.m.  The video was also not available because, by the time officers returned to the restaurant to record a copy of the video, the surveillance video had already recorded over itself.  We provide details from the officer's testimony regarding the video to emphasize several sources corroborate that Erik went to the restaurant in the early evening of May 27.

24

given me the money to keep my mouth closed," and then Campo shot Erik. Cell phone records confirm that a phone attributed to Mendoza called Campo at 6:12 p.m., connecting for 1 minute, 10 seconds, and again called at 6:29 p.m., connecting for 1 minute and 16 seconds. Campo called Mendoza back at 6:55 p.m., still using a tower consistent with Campo being at the warehouse.

Kristian testified that when he arrived at the warehouse, he unlocked the door, turned on the lights, panicked when he saw blood on the floor, and drove away, only to return shortly later to see Campo's black Range Rover pull up to the warehouse and Rios jump out of the passenger side. LaFontaine called 9-1-1 at 9:03 p.m. and reported that they believed the people who had killed Erik were around because they had seen Rios get out of Campo's vehicle. Cell phone records show that Campo's phone used towers southwest of the warehouse starting at 8:36 p.m., but then used the tower near the warehouse again at 9:10 p.m., consistent with Campo pulling up to the warehouse at a time when Kristian was frantically trying to leave the area. Cell phone records also show Campo's phone using a different side of the tower near the warehouse at 9:20 p.m. and moving to the southwest, and then using a tower at 9:52 p.m. that is consistent with where firefighters located Erik's body. Consistent with Zapata's testimony that Campo called her late at night and told her, "Mom, something bad has happened, something bad has happened and I have to leave," records show that Campo's

phone connected with Zapata at 10:25 p.m. for 2 minutes and 33 seconds. Mendoza testified that when she saw Campo later that night, "around 10:30, something like that," he asked her to go on a trip that night to Orlando. Cell phone records show that Campo's phone had traveled back toward their residence by 10:53 p.m.

Autopsy and DNA evidence also convincingly incriminates Campo together with Rios as Erik's killers. When officers searched the 4283 warehouse, they found, among other items, an orange bucket that contained a machete, a spent casing, and four gloves, three turned inside out. DNA evidence from the exterior of all four gloves matched Erik's DNA to a reasonable degree of scientific certainty.[8] The interior of one pair of gloves had a mixture of DNA profiles, with a major component matching Campo's DNA profile to a reasonable degree of scientific certainty. The interior of the other pair also had a mixture of DNA profiles, with a major component matching Rios' DNA profile to a reasonable degree of scientific certainty. Although Campo did not cut off Erik's foot to remove the GPS tracker, it is possible that he used the machete to cut off the tracker itself as the DNA profile from a stain on the machete matched Erik's DNA profile to a reasonable degree of scientific certainty. Inside a garbage can in the

---

[8] The minimum statistic for finding that a DNA profile matches a person's DNA sample to a reasonable degree of scientific certainty is that, in the absence of an identical twin, the match is rarer than 1 in 300 billion.

warehouse, officers found blood-stained clothing that matched LaFontaine's description of Erik's clothing the day he was killed—a black t-shirt, black shorts, and brown sandals. The black t-shirt had what appeared to an officer to be two bullet holes near the sleeve of the shirt and another possible bullet hole on the other side of the shirt. Erik's DNA matched the DNA profile found on the shirt.

Campo challenges the probative value of these DNA matches. For example, he elicited testimony on cross-examination that the gloves that were inside out were inside a bucket with fresh blood in the bottom and that they were transferred to the lab in one bag, suggesting that DNA could have transferred among the items or from other items in the bucket. Further, the DNA analyst admitted that it is possible that someone else could have used the gloves without leaving DNA on them. Campo's challenges were an attempt to cast doubt on the DNA evidence, but taking all inferences in favor of the jury's verdicts shows that the DNA evidence connecting Campo and Rios to these gloves with Erik's blood on them was reliable. Even though three of the gloves were turned inside out, there were no blood stains on the inside of the gloves where the DNA analyst found matches for Campo's and Rios' DNA, indicating that the gloves were not likely contaminated by the fresh blood in the bucket. As the government convincingly argued in closing statements, "Andres Campo literally had Erik Comesana's blood on his hands." R. 335 at 91:9–10.

27

Finally, there is sufficient evidence that Campo discharged a firearm resulting in Erik's death. The autopsy revealed that Erik was shot twice and that was the most likely cause of his death. According to the story Campo told Torres, he shot his gun multiple times and, although the gun jammed, some of the shots hit Erik. Officers recovered two spent casings and two projectiles from the warehouse. The ballistics examiner testified that the casings were Remington 9 mm Luger casings. The marks indicated that a firearm with an elliptical firing pin shot both casings, which narrowed the potential firearms to either a Glock or a Smith & Wesson pistol. The projectiles were also 9 mm projectiles and the markings revealed that the firearm that shot the projectiles had six lands and grooves cut into the barrel with a left-hand twist. Two possible weapons that could have fired the projectiles include a Colt AMT or a Glock pistol with an aftermarket barrel—that is, a barrel purchased separately to replace the original barrel. The ballistics examiner compared the casings and projectiles to various firearms recovered during the course of the investigation, including two Smith & Wesson pistols Trejos-Ortiz had given to his neighbor for safekeeping, the pistol Kristian brought with him to look for his brother, and Rodriguez's Sig Sauer firearm. The examiner concluded that none of those firearms fired the casings and projectiles. Both Rodriguez and Loaiza testified that Campo carried a Glock pistol with an aftermarket barrel. Rodriguez testified that Campo carried two guns, a revolver

28

with a wooden handle and a Glock, either a 26 or 27 model, and that Campo had ordered some threaded barrels for the Glock pistol. Loaiza testified that Campo carried a 9 mm Glock 17 and that Rios carried a baby Glock pistol, potentially a .22 caliber, and that both had a modified barrel on their pistols. Other evidence also suggested that Campo changed out barrels on his Glock pistol. When officers searched the garage associated with Campo's firearm trafficking scheme, they found a .40-caliber Glock 27 slide and a Lone Wolf 9 mm barrel with a threaded end cap and threaded barrel. The Lone Wolf barrel can be placed on a Glock .40-caliber frame that, with a 9 mm firearm magazine, creates an operable firearm that uses 9 mm ammunition. Campo argues that the government could not prove that the casings and projectiles had anything to do with Erik's death because there was no visible blood or body tissue on the projectiles. But Kristian testified that the warehouse was never used for target practice. Further, Campo told Torres that he was concerned about a spent casing that Rios placed in the trash that would be evidence against him, and officers in fact found one of the spent casings in the orange bucket that contained the used, bloody gloves. A reasonable jury could conclude the casings and projectiles were connected to Erik's death.

All in all, there is sufficient evidence for the jury to find, beyond a reasonable doubt, that Campo conspired with at least one other person to kill Erik; that he killed Erik to prevent Erik from communicating with law enforcement

29

officers regarding Campo's firearm trafficking scheme; and that Campo carried, used, and discharged a firearm, thereby causing Erik's death.

### 2. Count 11

Regarding the firearm trafficking offenses, Campo challenges only the charges in Count 11, which allege that on July 26, 2012—the date Campo was arrested—he knowingly received, concealed, bought, and facilitated the transportation and concealment of an AR-15 upper receiver, prior to exportation, knowing that it was intended for exportation, in violation of 18 U.S.C. § 554. Campo contends there is insufficient evidence that he intended to export the AR-15 upper receiver.

When police arrested Campo, they saw him approach and enter a Nissan Altima. After searching the car, they found the AR-15 upper receiver in the trunk. In the main part of the car, they found several documents including an Avianca Express document with different office locations highlighted, a list reading "twenty-five 80 percent," which is an unfinished firearm that goes along with many rifles including AR-15s, and a note that said "Tomorrow, Home Depot, get three sawhorses." R. 330 at 123:6–24. They also found a Taurus revolver with a wooden handle.

Sufficient evidence indicates that Campo intended to export the AR-15 upper receiver. Torres testified that in 2012, the firearm that Campo carried and

30

used was a .38 revolver with a wooden grip, not an AR-15 rifle.  Campo's

trafficking operation often used Avianca Express to ship parts to Colombia, and

they used sawhorses to conceal AR-15 lower receivers.  Torres also testified as to

how he would break apart an AR-15 upper receiver and hide its pieces within lawn

chairs, barbecue grills, and file holders to conceal the firearm part from customs.

The jury reasonably concluded that Campo intended to export the AR-15 upper

receiver that police found when they arrested him.

### B. Lay Opinion Evidence

Campo contends that the district court plainly erred when it permitted

Kristian to offer his "lay opinion" that, in the aftermath of seeing blood in the

warehouse, he thought Campo had killed his brother.  Federal Rule of Evidence

701 provides that a lay witness's "testimony in the form of an opinion" must  be

"rationally based on the witness's perception," "helpful to clearly understanding

the witness's testimony or to determining a fact in issue," and "not based on

scientific, technical, or other specialized knowledge within the scope of Rule 702."

Fed. R. Evid. 701.  Because Campo acknowledges that he did not object to

Kristian's testimony at trial, he argues that the district court plainly erred by

admitting it.  When "a defendant fails to preserve an evidentiary ruling by

contemporaneously objecting, our review is only for plain error."  *United States v.*

*Turner*, 474 F.3d 1265, 1275 (11th Cir. 2007).  Under the plain error standard,

31

Campo must show that: (1) an error occurred; (2) the error was plain; and (3) it affected his substantial rights. *Id.* at 1276. If Campo shows all three conditions, we may exercise our "discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation and internal quotation marks omitted).

Campo challenges Kristian's testimony explaining the 9-1-1 recordings:

Q. And when you were communicating "It's in a warehouse. It's in a warehouse," what did you mean it was in a warehouse?
A. It was in the warehouse where I sent my brother.
Q. And the address that you all are providing to the police when you're in that [panicked] state, what address is that?
A. 4283 Southwest.
Q. And is that the address where it happened?
A. Yeah.
Q. When you are saying, "They killed my fucking brother," who is the "they" that you are referring to?
A. Andres.
. . .
Q. And you [then say]: "Listen to me. Listen to me, okay. I know who killed him. I know who killed him. His name is Andres Campo." Why were you giving the police Andres Campo's name at the time?
A. Because he was the one who told my brother to go over there and that's -- I assumed that he was the one who did it. There was all his blood on the floor, it had to have been him.
Q. And had Andres ever told you that he had left the warehouse when you called?
A. No.

R. 331 at 110:11–22, 111:24–112:8. Campo also challenges Kristian's testimony when he described speaking with a police officer to report what he had seen:

Q. When you told [the police officer] the situation, what was your state?

32

> A.    That I thought we were being followed by the people that killed my brother.
>
> Q.    Who did you think had killed your brother?
>
> A.    Andres.

R. 331 at 115:23–116:2.

Campo contends that, because Kristian did not witness Erik's murder, his opinion about who killed his brother cannot be based on his own perception and is speculation based on a hunch. Campo relies primarily on *United States v. Marshall*, 173 F.3d 1312 (11th Cir. 1999), in which the Eleventh Circuit vacated a conviction after the district court improperly admitted lay opinion evidence. In that case, a DEA agent who had supervised the investigation stated during cross-examination that his informant had at least three separate sources of cocaine. *Id.* at 1315. On redirect examination, the government asked, "Do you believe that [the informant] acquired the crack cocaine that was recovered on the [dates in question] from another source?" to which the agent answered "No, sir, I believe it came from [the defendants]." *Id.* at 1315 & n.5. Because the agent was not present at the meetings between the informant and the defendants and had no personal knowledge regarding the origin of the cocaine the informant gave him, the admission of the testimony was improper under Rule 701. *Id.* at 1315. Notably, the Eleventh Circuit reviewed for abuse of discretion rather than plain error because the defendant objected to the testimony before the district court.

The government argues that Kristian's statements did not constitute opinion testimony subject to Rule 701, but rather show Kristian's state of mind in the immediate aftermath of seeing blood in the warehouse.  The government contends that a witness's testimony "about the contents of his mind *at a prior point in time*" is not opinion testimony of the kind that Rule 701 addresses, "even if expressed to the jury as a statement of opinion or belief."  Brief for the United States at 36 (emphasis added) (citing, e.g., *United States v. Morton*, 391 F.3d 274, 277 (D.C. Cir. 2004) ("A witness's testimony about his own state of mind is not opinion testimony.")).

We do not have to decide whether Kristian's previous "state of mind" as to who killed his brother is something other than opinion testimony subject to Rule 701's limitations because, even if it is opinion evidence, the district court did not plainly err in admitting the testimony.  As the government argues, had Campo objected to the testimony at trial, it could have laid a foundation that Kristian's opinion about who killed his brother was "rationally based on [his] perception" and helpful to understanding Kristian's testimony.  Fed. R. Evid. 701; *see Morton*, 391 F.3d at 277 (noting that the defendant's failure to object to an officer's testimony "deprived the Government of any opportunity to lay a proper foundation").  To that end, although Kristian did not see the killing, he witnessed events that led to his opinion and also testified to those events, including Campo's threats against Erik,

34

Campo's request that Erik meet him at the warehouse that evening, Campo's admission that he was at the warehouse, and that Campo's vehicle was at the warehouse right after Kristian found blood inside the warehouse. And even though Kristian's "opinion" about who killed his brother addresses an ultimate issue in the case, that alone does not make the testimony objectionable. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."); *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1004 (11th Cir. 1997) (stating that lay opinions regarding the "ultimate issue" in a case "are properly admitted if they are based on the personal observations of the witness"). Finally, even if the district court erred in admitting Kristian's lay opinion testimony, Campo has not met his burden to show that the error affected his substantial rights. *See Turner*, 474 F.3d at 1278 (noting that the defendant must bear the burden under the third prong of the plain-error analysis to show that the error "affected the outcome" of the trial, that is, that the error "made a difference in the jury's verdict"). As we discussed in relation to the sufficiency of the evidence, the evidence against Campo was overwhelming even without Kristian's "opinion" that Campo killed Erik. Any purported error here does not warrant a new trial because Campo cannot show that correcting the error would have affected the jury's verdict.

## C. Double Jeopardy

Campo argues the district court violated the Double Jeopardy Clause of the Fifth Amendment when it sentenced him to consecutive sentences for Counts 3 and 4 because, in his view, Count 3 is a lesser included offense of Count 4. We usually review claims of double jeopardy *de novo*, but when, as here, the issue was not properly raised before the district court, we review for plain error. *United States v. Bobb*, 577 F.3d 1366, 1371 (11th Cir. 2009); Fed. R. Crim. P. 52(b). "It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003).

In Count 3, Campo was charged with violating 18 U.S.C. § 924(c)(1)(A)(iii), which provides that "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall . . . be sentenced to a term of imprisonment of not less than 10 years" if the firearm is discharged. Count 4 charged a violation of § 924(j), which provides that "[a] person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall . . . be punished by death or by imprisonment for any term of years or for life" when the killing is a murder. Campo strongly argued on appeal that Count 3 is a lesser

36

included offense of Count 4 and that Congress did not authorize cumulative punishments for these offenses. But he cannot show precedent from the Supreme Court or this Court that directly resolves the issue in his favor. On the contrary, any error here cannot be plain because, as Campo admits, the Eleventh Circuit "has suggested a different result." Appellant's Br. at 48. In *United States v. Julian*, 633 F.3d 1250 (11th Cir. 2011), the issue was whether § 924(c)(1)(D)'s prohibition on concurrent imprisonment terms applied to a conviction under § 924(j). 633 F.3d at 1252; *see* 18 U.S.C. § 924(c)(1)(D)(ii) ("[N]o term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence . . . during which the firearm was used, carried, or possessed."). As part of the government's argument that § 924(j) established a sentencing factor applicable to a conviction under § 924(c) rather than creating a separate offense from § 924(c), the government argued that sentencing under both § 924(c) and § 924(j) would violate the Double Jeopardy Clause. *Id.* at 1256. The panel was unpersuaded. It noted that "'[i]f the statutes under which the defendant was sentenced specifically authorize cumulative punishments for the same offense, a court may impose cumulative punishment without running afoul of the Double Jeopardy Clause.'" *Id.* (quoting *United States v. Kaiser*, 893 F.2d 1300, 1304 (11th Cir. 1990)). Further, the panel stated that "it is irrelevant for Double

Jeopardy purposes that proof of a violation of section 924(j) always proves a violation of § 924(c)." *Id.* at 1257 (citation and internal quotation marks omitted). Rather than showing the district court plainly erred, these statements in *Julian* suggest the opposite is true. We conclude the district court did not plainly err and affirm its imposition of separate sentences for Counts 3 and 4.

## IV. Conclusion

In light of the foregoing, we affirm Campo's convictions and sentences. Because we decline to review Campo's ineffective assistance of counsel claim on direct appeal, Campo may raise it in a subsequent 28 U.S.C. § 2255 motion if he chooses and timely files it.

**AFFIRMED.**